Filed 12/19/13  P. v. Aguilar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MANUEL ESTRADA AGUILAR,<br><br>　　Defendant and Appellant. | F065184<br><br>(Super. Ct. No. 11CM7345)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

Manuel Estrada Aguilar was convicted of the first degree murder of Hermina Gamez.  He argues now that insufficient evidence of premeditation and deliberation was presented at trial; that the prosecutor made a prejudicially erroneous statement to the jury about the provocation standard for voluntary manslaughter; that the trial court gave

conflicting instructions on the issue of the required mental state for murder; and that several items of evidence were erroneously admitted. We affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORIES

On the morning of June 25, 2011, Aguilar walked into the police station in Corcoran and confessed to having just killed Gamez, a woman with whom he had been cohabiting for several months. An officer went to Gamez's house and found her dead. She had been stabbed 15 times and a knife was beside her body. The district attorney filed an information charging Aguilar with one count of murder. (Pen. Code, § 187, subd. (a).)[*]

At trial, Gamez's sister Mary Chavez testified about a conversation she had with Gamez a week before her death. Gamez told Chavez she had asked Aguilar to move out because of his drinking. Aguilar did not want to move out. He asked for a second chance, and they continued to live together. Chavez was not aware of any other domestic problems between Gamez and Aguilar.

At about 8:30 on the morning of the killing, Chavez drove by Gamez's house and stopped her car. She saw Aguilar in the front yard and called his name. Aguilar did not answer. He "looked different" to her and "seemed like restless, like a restless man walking back and forth .…"

Around 9:30 the same morning, Gamez came to Chavez's house. Gamez "seem[ed] like kind of nervous like she wanted to tell me something, but she didn't tell me nothing."

Nancy Hernandez, a neighbor of Gamez, testified that she was in her front yard the morning of the killing. She heard two or three "screams, loud screams like a man was screaming" emanating from Gamez's house. They were "like long screams like if somebody was in pain." This happened around 11:00 a.m. or earlier. When defense

---

[*]Subsequent statutory references are to the Penal Code unless otherwise noted.

2.

counsel asked whether it sounded like a "scream … of somebody who screamed out because of a tragedy that they just witnessed or did," Hernandez said, "It just sounded to me like somebody was hurt." Hernandez went inside to try to call the police, but the battery in her cordless telephone was discharged. She went back outside and saw Gamez's car leaving and heading into town. Police cars arrived at Gamez's house a few minutes later.

A dispatcher with the Corcoran Police Department testified that Aguilar came into the police station at 10:36 on the morning of the killing. Aguilar began speaking to the dispatcher in Spanish, but she did not understand. Then he said "I kill" two or three times and the name Hermina Gamez. An animal control officer who was at the police station spoke with Aguilar in Spanish. Aguilar told the officer he had come to turn himself in because he had just killed his wife. Aguilar's demeanor was calm and cooperative. Aguilar gave officers Gamez's address and helped them find the house when they radioed back that they were having difficulty.

Sergeant Steven Chee testified that he locked Aguilar in a cell and drove to the address. He found Gamez on the floor in a pool of blood, with no signs of life. Her skin was cool to the touch. On the floor beside her was a large knife. Sergeant Chee thought it looked like a hunting knife because "the blade tips [were] curved up for skinning." On cross-examination, he agreed that it could have been a kitchen knife instead.

Dr. Burr Hartman testified about the autopsy he performed. He found 15 stab wounds. Seven of these were chest wounds, which in combination were surely fatal. At least three of the wounds were seven inches deep. Wounds to the chest and abdomen punctured both lungs multiple times and lacerated the liver, spleen, and pancreas. There were defensive wounds to both hands and a stab wound to the forehead. Hartman described some of the wounds as "sharp on both edges," indicating that a double-edged knife was used. Gamez died within minutes of the infliction of the wounds. Asked for his opinion about whether the wounds were consistent with a killing in the heat of

passion, Hartman said yes, "because of the number and severity of the wounding," but he opined that the wounds could be consistent with "some other scenario" as well, such as "[p]rofound hatred or some other thing …."

Jimmy Roark, a police department evidence technician, collected the evidence at the scene. He found the knife, which had a seven-inch blade and a four-inch black plastic handle. He testified that the knife looked "homemade." In the kitchen, one drawer was open, a "junk drawer" containing "utility items, batteries, things like that." Roark checked inside other drawers that were closed. One drawer contained nine knives and another contained two knives. In the dish drain beside the sink were a butcher knife or chef's knife and a steak knife.

Back at the police station, Detective Pedro Castro interviewed Aguilar several hours after Aguilar gave himself up. Aguilar told Castro he had moved into Gamez's house about six months before, in January 2011, and had known her for about three months before that. The day before the killing, Gamez went to see a former boyfriend "and did not tell me she had gone to see him. But I suspected she had gone to see him because she arrived very changed." On the morning of the killing, Gamez got up early and went to work. Aguilar got up and did some gardening work in the yard, watering plants and cutting roses. Gamez came home around 9:30 a.m. and was angry. She said she was returning to her former boyfriend and told Aguilar to leave the house. She wanted him to stop gardening and leave. He said he would go, and went and got a box and a basket to pack his clothes. He wanted to make her breakfast before leaving, but she repeated that she wanted him to leave and hit him on the head with a bread bag. Aguilar got mad, and Gamez said she was going to call the police on him. He said "call them on me for something" and attacked her. Gamez was leaving and had reached the living room. Aguilar took a knife from a drawer, pulled Gamez back by the hand and stabbed her. He said he could not say where he stabbed her or how many times because he was blinded by rage at the time and did not remember. He said he became enraged because

4.

he loved Gamez.  He had drunk about five beers that morning.  About 20 minutes had passed since Gamez returned from work at 9:30 a.m.

In his testimony, Detective Castro mentioned that Gamez's house was "a couple minutes" by car away from the police station.  He also said the Corcoran District Hospital is three blocks closer to Gamez's house than the police station.

After the stabbing, Aguilar said he wanted to help Gamez; he shook her and told her not to die.  Then he got in Gamez's car and drove to the police station because, he said, he wanted to get help for her.  She was still breathing when he left.  When asked why he did not telephone for an ambulance, he said it was better to come to the police station.  He claimed that when he arrived, he told the officers to go help Gamez.  Aguilar denied that he and Gamez had had arguments or fights in the past.

Nieves Arredondo testified that Aguilar was her former live-in boyfriend.  They became lovers in March or April of 2009 and moved in together in October 2009.  In December 2009, they argued because Aguilar thought Arredondo was spending too much time with her family.  He grabbed her necklace and pulled her toward him.  When the necklace broke, she threw it at him and told him to move out because he was too controlling.  Aguilar pulled out a knife and moved it toward her chest.  The knife got stuck in Arredondo's bra.  She felt pressure and it made a mark, but did not draw blood.  When asked about Aguilar's facial expression as he did this, Arredondo said "[h]e was like he didn't care about anything."  Arredondo "panicked" and "started laughing because it was funny that [the knife] was stuck in there .…"  She had been drinking and did not take the incident seriously at the time.  Aguilar pulled the knife out of a plastic part of the bra.  Then someone outside called to Aguilar.  The confrontation ended when he went out.  Aguilar lived in a back bedroom for about a month and a half afterward, and then moved out of Arredondo's home.  At some point after the confrontation, Arredondo asked Aguilar if he had intended to stab her.  He said he was just trying to scare her.

In July 2010, Aguilar asked Arredondo if he could move in again because he was unemployed and had stopped receiving unemployment benefits. Arredondo said yes, and they became lovers again about a month later. In November 2010, Arredondo again told Aguilar to move out because he had been checking her phone and was too controlling. This happened just before Arredondo's favorite television program was scheduled to start. Aguilar told her to watch it "because it will be the last time you see it, you are going to die tonight." Aguilar was angry and Arredondo believed he was serious. She watched the program, and when it was over, Aguilar grabbed her by the shoulders, pushed her against a wall, and handed her a phone. "He said, 'Call the cops and tell them you are going to be dead when they get here, that I killed you.'" Then he held her hands above her head and pinned her leg against the wall with his knee. He called her "a whore and a puta" and said she was "worthless." He said he "didn't like older [women]" (she was 10 years older than he was) and was with her "out of pity." He told her he had four guns and had once shot at Rosa, a former girlfriend, but missed. Next, he drew a knife and held it to Arredondo's throat. She struggled, freed a hand, and scratched him, drawing blood. Aguilar looked shocked. He went and changed his shirt, and when he returned, he still had the knife and said, "Now you really are going to die, puta, because you got my DNA on your finger." He seized her hand and scraped under her nails with the knife. He then insisted that they go to a store, and he pulled her by the hand. He had the knife in his pocket. Arredondo said she would tell the store clerk he had threatened her. He took out the knife, opened it, concealed it under his shirt, and said "Tell him, and I will kill him first and then I will kill you." Inside the store, Arredondo did not ask for help because she was afraid. They went home. The next day, Arredondo called the police. She told them what happened and that she wanted him to move out. Arredondo left the apartment with her son and daughter while the police told Aguilar to leave. Aguilar moved out.

Detective Castro testified that Aguilar did not mention Arredondo when questioned about prior girlfriends. Officer Herlinda Rodriguez testified that Arredondo called the police to get Aguilar out of her home, but did not mention in an initial interview that he had threatened and assaulted her. Arredondo did mention it in a second interview.

The jury was instructed on three theories of homicide: first degree murder based on willful, deliberate, and premeditated killing; second degree murder; and voluntary manslaughter based on heat of passion or a sudden quarrel. The instructions explained that provocation could reduce the offense from first degree murder to second degree murder or from murder to voluntary manslaughter. To reduce the offense to voluntary manslaughter, the provocation must be strong enough to cause "a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment"; and as a result of the provocation, Aguilar must have "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment."

In his closing argument, defense counsel admitted that Aguilar killed Gamez and did so intentionally. He asked the jury to find Aguilar guilty of voluntary manslaughter based on evidence that he killed her in the heat of passion after she terminated their relationship.

During its deliberations, the jury sent the judge a question: "Please explain the differences between first and second degree murder. We have a definition for first degree [CALCRIM No.] 521 but [CALCRIM No.] 520 doesn't tell us what 2nd degree is." Before the court responded, however, the jury told the bailiff it had answered its own question and no longer needed help.

The jury found Aguilar guilty of first degree murder. The court imposed a sentence of 25 years to life.

### DISCUSSION

### I. Sufficiency of evidence of premeditation and deliberation

Aguilar contends that insufficient evidence was presented at trial to support the jury's finding that his killing of Gamez was deliberate and premeditated. The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well-established:

> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.… We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

"To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.) Deliberation, as the jury was correctly instructed in accordance with CALCRIM No. 521, requires that the defendant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." Premeditation requires that he "decided to kill before completing the act that caused death." The jury was further correctly instructed as follows:

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

Our Supreme Court has held:

> "Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning,

motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 …, 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

The evidence can be sufficient if there is "'some evidence of motive in conjunction with … a deliberate manner of killing.'" (*People v. Cole, supra,* 33 Cal.4th at p. 1224.) In this case, there was substantial evidence of motive. Aguilar told Detective Castro that the day before he killed Gamez, he became persuaded that she had gone to see a former boyfriend. A week before, Gamez had told Aguilar she wanted him to move out. From Arredondo's testimony about prior domestic violence, the jury could infer that, for Aguilar, the imminent threat of a breakup of a relationship with a woman was a motive for violence against the woman.

There also was substantial evidence of a deliberate manner of killing. From the testimony of Jimmy Roark, the evidence technician, and from Aguilar's statement to Castro, the jury could reasonably find that, instead of grabbing the first weapon that came to hand, Aguilar passed over some knives in the dish drain and a drawer full of knives and opened a junk drawer to select a seven-inch, double-edged knife as the murder weapon. Next, instead of immediately striking out randomly or wildly, Aguilar by his own admission grasped Gamez by the hand and pulled her back toward him as she tried to escape, and then struck.

The jury also could reasonably find that Aguilar intended to allow Gamez to bleed to death after he stabbed her. Instead of calling an ambulance, taking Gamez to the hospital, or asking a neighbor for help, as would support his claim that he acted from blind rage and was immediately remorseful, he drove to the police station (which was

9.

farther from Gamez's house than the hospital) and calmly reported that he had killed Gamez. Aguilar told Castro he attacked Gamez 20 minutes after she arrived home at 9:30 a.m., but he did not arrive at the police station until 10:36 a.m. Gamez's house was two minutes from the police station. Officers went to Gamez's house right away, but Gamez's body was cold when they arrived. It has been held that a rational inference of premeditation can be based on evidence that a defendant allowed a victim to bleed to death after inflicting injuries. (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1024.)

From all this evidence, the jury could reasonably find that Aguilar reflected and decided to kill Gamez because she was leaving him.

In addition to claiming that the above evidence is insufficient, Aguilar claims there was affirmative evidence negating premeditation and deliberation to which the jury was required to give dispositive weight. He mentions the testimony that a man's voice was heard screaming in pain at the time of the killing, which he says shows Aguilar's immediate remorse and undermines the claim of premeditation. He discusses his own statement that he was blinded by rage when he attacked. He maintains that he would have fled instead of turning himself in if he had killed Gamez deliberately and premeditatedly. And he points out that he had drunk five beers before the stabbing.

Aguilar's argument about this evidence is nothing more than an invitation to reweigh the evidence. As we have explained, there was substantial evidence of premeditation and deliberation. The existence of conflicting evidence is not grounds for reversal. The weighing of the evidence is the jury's task and we do not reevaluate the evidence's weight on appeal.[†]

---

[†]After waiving oral argument, Aguilar submitted a letter requesting that we consider *People v. Boatman* (Dec. 4, 2013, E054852) ___ Cal.App.4th ___ as authority in support of his argument that there was insufficient evidence to support the finding of premeditation and deliberation. We have reviewed *Boatman* and conclude that the evidence of premeditation and deliberation was considerably weaker in that case than in this one. *Boatman* does not persuade us that the evidence is insufficient here.

## II.    *Prosecutor's argument on provocation*

Aguilar maintains that the prosecutor committed misconduct by misstating the standard for provocation sufficient to reduce murder to manslaughter. As we will explain, the prosecutor did misstate the standard during her closing argument, but the error was not prejudicial.

A homicide that would otherwise be murder is reduced to voluntary manslaughter if the killer acted in response to a provocation strong enough to cause a person of average disposition to act rashly and under the influence of passion rather than judgment. (*People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Beltran* (2013) 56 Cal.4th 935, 957.) This standard does *not* mean a defendant's act of killing must be a reasonable act or the act any reasonable person would do under the same circumstances. Logically, it could not mean that, since killing without judgment and under the influence of passion is, by definition, not reasonable. Our Supreme Court made this point recently in *People v. Beltran, supra*, in which the Attorney General argued that the test for sufficient provocation should be "whether an ordinary person of average disposition would be moved to kill." (*Id.* at p. 946.) Rejecting this position, the court "reaffirm[ed] … the standard for determining heat of passion that we adopted nearly a century ago. Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' ([*People v. Logan* (1917) 175 Cal. 45, 49.])" (*Id.* at p. 957.) The court explained that the Attorney General's position was "inconsistent with the conceptual underpinnings of heat of passion as a circumstance which *mitigates* culpability for a killing but does not *justify* it.… [S]ociety expects the average person not to kill, even when provoked. As Professor Dressler stated, we punish a person who kills in the heat of passion or upon provocation because '[h]e did not control himself as much

11.

as he *should* have, or as much as common experience tells us he *could* have, nor as much as the ordinarily law-abiding person *would* have.' [Citation.]" (*Id.* at p. 949.)

The jury was correctly instructed on the provocation standard in accordance with CALCRIM No. 570, which states in part:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.     The defendant was provoked;

"2.     As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3.     The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] … [¶]

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

In discussing the provocation standard for voluntary manslaughter during her closing argument, however, the prosecutor asserted that the proper inquiry was whether a reasonable person would have done the same thing—i.e., killed Gamez—under the circumstances:

"You're also given another choice, and that is [voluntary] manslaughter. And [voluntary] manslaughter does involve an intent to kill, but it—it is a type of killing where we recognize that the defendant was provoked, he acted rashly and without due deliberation, and that a person of average disposition, a normal person, just an [average] Joe would feel the

12.

same kind of provocation, and would rashly and without due diligence *act in the same way*." (Italics added.)

Defense counsel objected, saying this misstated the law. The court overruled the objection, but told the prosecutor, "I am going to refer you to the instructions." The court told the jury, "And, ladies and gentlemen, recall my comments what the attorneys say is not evidence. If the attorneys tell you something that is different than the law as I explained it to you in the instructions, you're to follow the law contained in the instructions." The court did not say that the prosecutor's formulation was erroneous.

Later in her argument, the prosecutor made other remarks implying that the relevant inquiry is whether a reasonable person would kill under the circumstances: "What really he said in his interview that provoked him was that she was going to call the police. Is that provocation to kill?" "So, yes, our [feelings] get hurt when we get dumped, but we're not asking you to evaluate what someone's feelings might be when they're dumped. We're asking you what would the person who is of average disposition act when they got dumped. And this is where the defendant's argument for manslaughter fails. Because when we get dumped, we do not act out by killing the person who dumped us."

The prosecutor's remarks were incorrect for the reason we have indicated: The proper inquiry in determining whether provocation was sufficient to reduce murder to voluntary manslaughter is whether a person of average disposition would have been moved to act from passion rather than judgment, not whether such a person would have killed. We must determine, therefore, whether the prosecutor's mistake was prejudicial or harmless.

Contrary to Aguilar's argument, the applicable standard for harmless-error review is that of *People v. Watson* (1956) 46 Cal.2d 818, i.e., the error is harmless unless there is a reasonable probability the defendant would have obtained a better outcome absent the error. The standard of *Chapman v. California* (1967) 386 U.S. 18—that an error is

13.

reversible unless it is clear beyond a reasonable doubt that it did not affect the outcome—does not apply. Our Supreme Court so held in *People v. Beltran, supra*, 56 Cal.4th 935. There, just as in this case, the prosecutor erroneously suggested in closing argument that murder could be reduced to voluntary manslaughter on a heat-of-passion theory only if the provocation were found to be sufficient to cause an ordinary person to kill. (*Id.* at p. 954.) The Supreme Court rejected the defendant's claim that the *Chapman* standard applied to appellate review of this error because the prosecutor's erroneous argument deprived him of federal constitutional rights. The court stated that the *Watson* standard applied because, in noncapital cases, the rule requiring sua sponte instructions on lesser-included offenses such as voluntary manslaughter derives exclusively from California law. (*People v. Beltran, supra,* at p. 955.)

The error in this case was harmless under the *Watson* standard for three reasons. First, in finding Aguilar guilty of first degree murder, the jury rejected a verdict of second degree murder and found Aguilar had deliberated and premeditated before killing Gamez. This finding was logically inconsistent with a finding that Aguilar killed in the heat of passion. Aguilar does not challenge the correctness of the first degree murder instructions. Where a factual question is necessarily resolved adversely to a defendant under correct jury instructions, omission of other jury instructions bearing upon the same factual question is harmless. (*People v. Sedeno* (1974) 10 Cal.3d 703, 720-721, overruled on other grounds by *People v. Breverman* (1998) 19 Cal.4th 142, 149.)

Second, the court gave the jury correct instructions on voluntary manslaughter, referred the jury to them when defense counsel objected to the prosecutor's argument, and said the instructions must be followed even if they conflict with arguments of counsel. We assume jurors follow judges' instructions. (*People v. Hamilton* (1988) 45 Cal.3d 351, 375.)

Third, the evidence of heat of passion, although sufficient to warrant instructions on that theory, was not strong. Aguilar told Detective Castro he was blinded by rage, and

14.

in this appeal he claims he was overwhelmed by the news that Gamez was breaking up with him to return to her old boyfriend. Yet the information that Gamez wanted him to move out so she could return to the old boyfriend was not a sudden revelation to Aguilar. According to Mary Chavez, Gamez had already asked Aguilar to move out a week before because of his drinking. The day before, Aguilar had concluded from Gamez's behavior that she had already been to see her former boyfriend. Further, by his own admission, it was not the request that he move out that led to the stabbing. His reaction to that request, according to his statement to Detective Castro, was to get a box and a basket to pack his belongings, and to offer to make breakfast for Gamez. It was not until Gamez threatened to call the police to get him out that Aguilar attacked. He decided to give Gamez "something" to "call them … for," and then carried out his decision.

Aguilar contends that *People v. Berry* (1976) 18 Cal.3d 509 stands for the proposition that a finding of premeditated first degree murder never renders harmless the commission of error in giving instructions on voluntary manslaughter. We disagree. In that case, the trial court refused to give any instruction on voluntary manslaughter based on a heat-of-passion theory. (*Id.* at p. 512.) The Supreme Court held that the state of the evidence required the instruction to be given. (*Id.* at pp. 515, 518.) It then rejected the argument that the error was harmless because the jury found the defendant guilty of first degree murder and therefore must have found he did not act in the heat of passion. It reasoned:

> "While the instructions made passing reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees, such reference was only casually made. There was no clear direction to the jury to consider the evidence of [the victim's] course of provocatory conduct so as to determine whether defendant, as an ordinary man of average disposition [citation] having been exposed to such conduct, was provoked into committing the homicide under a heat of passion." (*People v. Berry, supra*, 18 Cal.3d at p. 518.)

Aguilar also relies on *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1485, in which the Court of Appeal followed *Berry*.

15.

*Ramirez* and *Berry* are distinguishable from this case. In those cases, the trial court gave *no instruction at all* on heat-of-passion voluntary manslaughter. Here, the court gave a correct instruction on that theory of homicide and directed the jury's attention to it when the prosecutor misstated the standard. Further, in this case, the evidence of heat of passion was weak. We do not think *Berry* and *Ramirez* mandate reversal here.

Aguilar also avers that there is "no inconsistency between premeditation and heat of passion. Even a defendant whose mind is clouded by anger may have sufficient rationality to plan in advance by obtaining a weapon, locating his victim, and intentionally killing him." This may be so, but heat of passion is inconsistent with *deliberation*. As the jury was instructed, deliberation requires that the defendant "carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill," while heat of passion requires the defendant to "act rashly and without due deliberation, that is, from passion rather than from judgment." Deliberation presupposes that judgment has been exercised. Heat of passion presupposes that judgment has been overcome.

Next, Aguilar argues that when a prosecutor makes an erroneous statement of law, the error is not rendered harmless by the court's instruction that the arguments of counsel are not evidence. He relies on *People v. Woods* (2006) 146 Cal.App.4th 106. There, the prosecutor made a "legally incorrect and constitutionally impermissible assertion that appellant had an obligation to produce witnesses to establish wrongdoing by the police, which the court left uncorrected," among other erroneous and improper statements. (*Id.* at p. 118.) The Court of Appeal held the trial court's instruction that arguments of counsel are not evidence was not enough to establish harmlessness. (*Ibid.*)

*Woods* is not comparable to this case. There, the prosecutor's remark was an unconstitutional shifting of the burden of production. It was one of several instances of improper conduct by the prosecutor, the "number and gravity" of which resulted in an

16.

aggregate prejudicial effect greater than the sum of its parts. (*People v. Woods, supra*, 146 Cal.App.4th at p. 117.) The jury instruction the People relied on to cure the misconduct was merely that arguments are not evidence; it did not include an admonition to refer to the other instructions and give them controlling weight over arguments of counsel. Here, by contrast, we deal with a single instance of prosecutorial misstatement bearing upon a state law issue. The court did refer the jury back to the instructions (although we acknowledge that it did not sustain defense counsel's objection and expressly explain the correct standard, as it ought to have done under the circumstances). The specific instruction given on the subject was correct, and the evidence of heat of passion was weak.

Finally, Aguilar insists that the evidence of heat of passion was "overwhelming," and that the killing "can only be explained by an outburst of rage." He mentions Aguilar's statement that he was blinded by rage, his turning himself in shortly after the stabbing, the male scream heard by the neighbor, and the autopsy doctor's testimony that the unnecessarily large number of wounds was consistent with an assailant acting in the heat of passion. In our view, this is far from being overwhelming evidence of heat of passion. It is merely evidence conflicting or competing with the evidence relied on by the prosecution. As we have said, we do not revise the jury's weighing of the evidence.

For all these reasons, we conclude it is not reasonably probable that, had the prosecutor not misstated the provocation standard for voluntary manslaughter, Aguilar would have been convicted of voluntary manslaughter instead of murder. Aguilar also argues that the prosecutor's misstatement influenced the jury's deliberations about whether to find him guilty of first or second degree murder, but there is no reasonable probability of this either. The prosecutor's remark was in the context of voluntary manslaughter and was not relevant to second degree murder. Provocation can reduce murder from first degree to second degree, but there is no rule in that context that the provocation must be of the kind that would cause a person of average disposition to act

from passion instead of judgment.  Contrary to Aguilar's assertion, the fact that the jury had a question about degrees of murder—and answered the question for itself before the trial court could respond—does not prove prejudice.

## III.    *Jury instructions on mental state*

Aguilar asserts that two instructions the court gave on the mental state for murder were in conflict with each other.  He says the instructions, in combination, allowed the jury to convict him of murder if it found he intended to kill Gamez, without considering whether he acted in the heat of passion.  We disagree.

The court instructed the jury on the issue of union of act and intent in accordance with CALCRIM No. 251.  The pattern instruction includes the following sentence:  "[The specific (intent/ [and/or] mental state) required for the crime of _____ *<insert name[s] of alleged offense[s] e.g., burglary>* is _____ *<insert specific intent>*]."  In the copy given to the jury for its use in deliberations, this sentence read:  "The specific intent required for the crime of MURDER is INTEND [*sic*] TO KILL."  The court also instructed the jury with CALCRIM No. 520, which explains that murder requires "a state of mind called malice aforethought."  The instruction defines malice aforethought as either an intent to kill or a conscious disregard for human life.  Aguilar's contention is that these two references to the mental state for murder are inconsistent with each other and the inconsistency prejudiced him.

It is true that the version of CALCRIM No. 251 the court gave is incomplete because it references only express malice—i.e., intentional killing—and omits implied malice—i.e., killing with a conscious disregard for life.  Assuming the beyond-a-reasonable-doubt standard of harmless-error review applies (*Chapman v. California, supra*, 386 U.S. 18), however, we see no possibility that Aguilar was prejudiced by this omission.

Aguilar's theory is that, because the version of CALCRIM No. 251 given to the jury did not refer to malice aforethought, the jury would feel it was relieved of the

18.

obligation to apply the instructions explaining that heat of passion can reduce murder to voluntary manslaughter. He says that, because those instructions do not explicitly state that heat of passion can negate malice, and at the same time CALCRIM No. 251 said the state of mind required for murder is intent to kill, the jury could have found he committed murder because he had the intent to kill, regardless of whether he acted in the heat of passion.

Aguilar's conclusion does not follow from his premises. CALCRIM No. 570, which the court used, gives a clear explanation of the law of voluntary manslaughter. The instruction stated that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." It went on to explain the standard for provocation that can result in a killing because of a sudden quarrel or in the heat of passion. The instruction did not give the alternative explanation of voluntary manslaughter Aguilar now refers to—i.e., that heat of passion negates malice and means the crime is not murder despite an intent to kill—but that did not make it any harder to understand. Indeed, although the instruction did not *state* that voluntary manslaughter is consistent with an intent to kill, it certainly implied that proposition. It stated that murder is reduced to manslaughter by a heat-of-passion finding, and since one theory of murder involves an intent to kill, a heat-of-passion finding can result in a manslaughter verdict despite the presence of an intent to kill.

The parties' focus throughout the trial, and especially in closing arguments, was on whether the offense was murder or voluntary manslaughter, and this was in spite of defense counsel's admission that Aguilar intended to kill Gamez. There is no reason to think the jury disregarded or failed to apply the instruction on voluntary manslaughter just because it was told that murder involves an intent to kill. The court's version of CALCRIM No. 251 was, if erroneous, harmless beyond a reasonable doubt.

19.

## IV. *Evidence of prior domestic violence*

The prior acts of domestic violence, testified to by Nieves Arredondo, were admitted into evidence pursuant to Evidence Code section 1109, subdivision (a)(1), which provides:

> "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Aguilar maintains that the prior acts were not admissible because they were not relevant to a disputed issue. He says the evidence tended to show only that he perpetrated the killing, which he did not deny; it did not support the prosecution's position on the disputed aspect of the case, which concerned only whether Aguilar was acting in response to provocation and whether that provocation was sufficient to reduce the crime to voluntary manslaughter or second degree murder. Although his plea of not guilty put all elements of the offense in issue (*People v. Balcom* (1994) 7 Cal.4th 414, 422-423), he says his decision to concede that he intentionally killed Gamez means that the prior-acts evidence was cumulative and its probative value was substantially outweighed by its prejudicial effect under Evidence Code section 352. We review the trial court's decision to admit the evidence for abuse of discretion. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 704.)

We reject Aguilar's contention that the prior-acts evidence did not tend to prove he acted without sufficient provocation to reduce the offense from first degree murder. Evidence Code section 1109 creates an exception to the rule that prior acts are not admissible to prove action in accordance with a propensity or trait of character. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.) In this case, Arredondo's testimony about Aguilar's prior acts of domestic violence were relevant to show a propensity to

20.

become violent toward women who were breaking off relationships with him or threatening to report his behavior. The jury could reasonably find that there was no provocation sufficient to cause a rash reaction in the prior instances and could reasonably conclude that Aguilar acted in accordance with the same propensity in this case. The evidence was not substantially more prejudicial than probative under Evidence Code section 352. To the contrary, it is precisely the type of evidence that Evidence Code section 1109 is designed to allow. Such evidence is always seriously damaging to the defense, but the Legislature has deemed that it also is highly probative.

Aguilar cites *People v. Morton* (2008) 159 Cal.App.4th 239, in which evidence of prior domestic violence was admitted to prove a domestic battery with corporal injury and a misdemeanor assault. (*Id.* at pp. 242, 244.) The Court of Appeal upheld the trial court's decision to admit this evidence and affirmed the convictions. (*Id.* at p. 242.) Aguilar believes the case supports his position, however, because in a footnote the Court of Appeal remarked: "Certainly, the evidence he had previously engaged in domestic abuse without provocation in no way undermines the claim he did so in this case *after* provocation." (*Id.* at p. 247, fn. 3.)

Aguilar is mistaken. There was no question in *Morton* about whether the offense should be reduced because of provocation. The issue the defendant raised was, rather, that the prior incidents were not similar to the charged offense because the current behavior was provoked and the past behavior unprovoked. The point of the court's reference to provocation was that the prior acts tended to show a propensity to become violent during arguments with girlfriends, that this was so regardless of whether the defendant was provoked, and therefore the difference between provoked and unprovoked violence did not affect the question of admissibility under the circumstances. (*People v. Morton, supra,* 159 Cal.App.4th at p. 247.) The circumstances here are quite different. The jury could reasonably find the prior instances to be unprovoked, and, in light of all

21.

the evidence, could reasonably use that finding to support a further finding that Aguilar was acting in accordance with a propensity for unprovoked violence in this case.

As we have said, the prior-acts evidence also was relevant to the issue of motive, which in turn was relevant to the issue of premeditation and deliberation. Based on the prior acts, the jury could reasonably find that, for Aguilar, being broken up with was a motive for domestic violence even when it did not happen under circumstances of strong provocation.

In sum, the jury could reasonably find that the prior acts of domestic violence supported a finding that Aguilar acted in this case in conformity with a propensity to become violent toward girlfriends without sufficient provocation. The trial court therefore could find that the prior acts were highly probative with respect to the main disputed issue in the case. It did not abuse its discretion in admitting the evidence.

## V.     *Victim's hearsay statements*

Aguilar challenges the trial court's decision to admit into evidence Gamez's hearsay statements, presented through the testimony of Mary Chavez, about the incident a week before Gamez's death in which Gamez told Aguilar to move out. We review the trial court's decision for abuse of discretion. (*People v. Poggi* (1988) 45 Cal.3d 306, 319; *People v. Martinez* (2000) 22 Cal.4th 106, 120.)

At trial, Aguilar objected to the testimony on hearsay grounds. The objection was overruled.

The People maintain that the testimony was admissible pursuant to Evidence Code section 1250, which establishes a hearsay exception for statements of the declarant's state of mind. Gamez's state of mind—wanting to break up with Aguilar—was relevant to the issue of Aguilar's motive, which in turn was relevant to the question of whether he killed after premeditation and deliberation.

Aguilar relies on *People v. Riccardi* (2012) 54 Cal.4th 758. There, our Supreme Court held that if hearsay evidence is proffered to show a declarant's state of mind, and

the relevance of the declarant's state of mind is that the defendant might have been motivated by it, then the hearsay evidence is admissible only if there is "independent, admissible evidence that the defendant was aware of the [declarant's] state of mind before the crime and may have been motivated by it." (*Id.* at p. 820.) Aguilar contends there was no evidence, other than Chavez's testimony that Gamez said she asked Aguilar to move out, that he knew Gamez wanted to break up with him.

Aguilar is mistaken. In his statement to Detective Castro, Aguilar said that the day before the killing, he became convinced that Gamez had been with her old boyfriend. The jury could reasonably infer from this that Aguilar knew before the morning of the crime that the relationship was in jeopardy and that Gamez might soon end it.

Aguilar argues that this is not sufficient because Gamez said she asked Aguilar to move out a week before her death, while Aguilar said he believed Gamez visited her old boyfriend only a day before; he did not mention any earlier-arising suspicion. There is nothing in *Riccardi*, however, that suggests the required independent evidence must show the defendant knew the declarant's state of mind *at the time of the declarant's statement*. The Supreme Court stated only that the defendant must know of the declarant's state of mind before committing the crime.

Aguilar also asserts that the People cannot rely on Aguilar's statement to Detective Castro to satisfy the requirement of *Riccardi* because there is no record that the trial court relied on that evidence for that purpose. We reject this argument. *Riccardi* was decided on July 16, 2012, two months after Aguilar's trial. Aguilar's position implies that, in all cases to which the *Riccardi* rule applies that were tried before *Riccardi* was decided, there is error unless the trial court happened to anticipate *Riccardi* and placed its reasoning on the record. That cannot be correct. Further, there is no general rule that an evidentiary ruling is erroneous unless the trial court places on the record correct reasons in support of it. The rule is to the contrary. "On appeal, we presume that a judgment or order of the trial court is correct, '"[a]ll intendments and presumptions are indulged to

23.

support it on matters as to which the record is silent, and error must be affirmatively shown.""" (*People v. Giordano* (2007) 42 Cal.4th 644, 666.)

The cases Aguilar cites to support his notion that the trial court had to make a record of its reliance on *Riccardi* evidence are inapposite. (*People v. Bracey* (1994) 21 Cal.App.4th 1532, 1541 [inappropriate for Court of Appeal to affirm § 1385 dismissal for reasons other than those entered in minutes by trial court pursuant to statutory mandate to record reasons]; *Reinert v. Superior Court* (1969) 2 Cal.App.3d 36, 42 [inappropriate for Court of Appeal to uphold search based on reasons other than those presented to magistrate with warrant application].)

## VI. *Lay-opinion testimony*

Chavez testified that on the morning of the killing, Aguilar "looked different" to her and "seemed … restless" as he walked around Gamez's front yard. Aguilar's objection that this was speculation was overruled. He now argues that it was an inadmissible lay opinion.

Evidence Code section 800 allows admission of the opinion of a witness who is not an expert if the opinion is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of his testimony." (Evid. Code, § 800.) At the same time, "[g]enerally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman* (2006) 38 Cal.4th 344, 397.) We review the trial court's ruling for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)

Chavez's testimony that Aguilar "looked different" was rationally based on Chavez's perception. There was evidence that Chavez knew Aguilar and thus knew how he ordinarily looked: She testified that she drove up to the house and called out to him, supporting an inference that she was acquainted with him; and Aguilar told Detective Castro that Gamez's sisters knew "how well [Aguilar and Gamez] got along," supporting

24.

the same inference. Chavez's opinion that Aguilar's appearance was "different" was helpful to an understanding of the main point of her testimony, which was that there was something unusual about the way he was pacing around the yard. The trial court could reasonably conclude that Chavez's opinion that Aguilar "seemed … restless" was an admissible description of his behavior—pacing while looking different—as consistent with a restless state of mind, rather than an inadmissible opinion about his state of mind. The trial court did not abuse its discretion.

Aguilar cites *People v. Thornton, supra,* 41 Cal.4th 391, but that case does not help him. There the defendant asked a prosecution witness whether two people inside a car appeared from their behavior to know each other. The trial court sustained an objection that the question called for speculation. (*Id.* at p. 428.) The Supreme Court rejected the defendant's argument that the question asked for admissible lay opinion and the trial court abused its discretion in excluding it: "Under that deferential [abuse-of-discretion] standard, we cannot second-guess the court's ruling that asking the witness whether she thought the two vehicle occupants were acting as if they knew each other was speculative," as the ruling did not fall outside the bounds of reason. (*Id.* at p. 429.) This holding does not imply that the court would have abused its discretion if it had admitted the testimony. Under the abuse-of-discretion standard, it is logically possible for either of two opposing rulings to be affirmed on appeal, since both rulings could be within the bounds of reason.

Aguilar next cites *People v. Houston* (2012) 54 Cal.4th 1186, but that case also fails to support his position. The defendant claimed he shot the victim because the victim had been sexually abusing him. A friend of the defendant testified that the defendant often discussed sexual matters with him, never mentioned the claimed abuse, and would have mentioned it if it had really occurred. (*Id.* at p. 1221.) The Supreme Court held:

> "[The friend's] testimony that he and defendant often discussed
> sexual matters was relevant and admissible. The same is true for [the
> friend's] testimony that defendant never discussed with him the claimed

25.

molestation by [the victim].  It also would have been proper for [the friend] to express his opinion that it would be normal for them to discuss such personal matters, as such testimony would shed light on the nature of their relationship.  But in the testimony at issue, [the friend] went a step farther. He did not say it would have been normal for defendant to discuss with him the alleged molestation by [the victim].  Instead, he specifically testified that defendant 'would have told me such a thing.'  This statement was speculative and not based on anything [the friend] might have perceived through his physical senses, and his opinion on the matter did not help the jury understand the rest of his testimony." (*People v. Houston, supra,* 54 Cal.4th at p. 1222.)

The present case is not similar.  Chavez did not engage in speculation about what Aguilar might do under hypothetical circumstances.  She said he looked different and seemed restless.  These opinions were based on what she saw, and the court could reasonably find they would help the jury for the reasons we have stated.

## VII.    *Cumulative error*

Aguilar argues that if any of the errors he asserts were harmless on their own, they were prejudicial cumulatively.  We have found two harmless errors:  the prosecutor's misstatement of the provocation standard for voluntary manslaughter and the trial court's incomplete statement of the mental state required for murder in one of the jury instructions on that subject.  The first of these errors is harmless because the trial court gave a correct instruction on provocation and referred the jury to it at the time of the misstatement; the jury made a finding under other correct instructions that resolved the same factual question against Aguilar; and the evidence of provocation was weak.  The second error was harmless because, despite the one incomplete instruction, the jury received correct instructions on all the mental-state findings it had to make, and there is no reason to think the incomplete instruction interfered with its reasoning.  Assuming, as we did above, that the latter error must be tested for prejudice under the beyond-a-reasonable-doubt standard of *Chapman v. California, supra,* 386 U.S. 18, we conclude that in combination these errors remain harmless beyond a reasonable doubt.

## *DISPOSITION*

The judgment is affirmed.

_____

Oakley, J.[‡]

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Peña, J.

---

[‡]Judge of the Superior Court of Madera County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.